No Error.

### STATE v. JACOB WOLF.

(Filed 16 October, 1907).

1. **Indians —Compulsory Attendance at Government Indian School—Constitutional Law.**

    The Cherokee Indians are citizens of this State, and chapter 213, Laws of 1905, compelling, under certain conditions, the attendance of their children at the Government Indian School, is not repugnant to Article I, section 15, of the Constitution of North Carolina.

2. **Indians—School Districts—Particular Localities—Constitutional Law.**

    The Legislature can meet the needs of one county, district or locality without making the same act apply to the whole State. And chapter 213, Laws of 1905, constituting "all within the boundary known as the 'Qualla boundary' of the Cherokee Indian lands" a special school district, is not repugnant to Article I, section 15, of the Constitution of North Carolina.

3. Indians—Class Legislation—Discrimination—Constitutional Law.
> Chapter 213, Laws of 1905, is not discriminative against the Indians, applying alike to all Indians in the special school district.   (Article XIV, sec. 2, Constitution of North Carolina).

4. Same.
> Chapter 213, Laws of 1905, compelling the Indians within the "Qualla boundary," especially created a school district, to send their children, between the ages of seven and seventeen, to the Government Indian School at Cherokee, for nine months, under certain conditions, providing that the act shall not apply to children within said boundary attending other schools for a like period of time, is constitutional and valid.   (Article IX, sec. 2, Constitution of North Carolina).

HOKE, J., concurs in result. CONNOR, J., dissenting. WALKER, J., concurs in dissenting opinion.

INDICTMENT for the unlawful failure of the defendant, having more than one-eighth Indian blood in his veins, and residing in the "Qualla boundary," a special school district, to send his child to the Government Indian School therein, tried before *O. H. Allen, J.,* and a jury, at March Term, 1907, of the Superior Court of SWAIN County.

From a judgment upon a special verdict of not guilty the State appealed.

The facts are sufficiently stated in the opinion of the Court.

*Assistant Attorney-General Clement* for the State.
*W. T. Crawford* for defendant.

CLARK, C. J.   Chapter 213, Laws of 1905, reads as follows:

"Section 1. That all within the boundary known as the 'Qualla boundary' of the Cherokee Indian lands, in Jackson and Swain Counties, in which is located the Government Indian School, at Cherokee, N. C., be and the same is hereby constituted a special school district.

"Sec. 2. That all children within said boundary are hereby compelled to attend school at least nine months in each calendar year, between the ages of seven and seventeen years: *Pro-*

*vided,* the Government of the United States shall furnish such school with all proper facilities, together with board, clothing, books, medicine, medical attendance and other necessary expenses: *Provided further,* that nothing in this act shall compel any sick or otherwise disabled child, or any child who is sole person or necessary for the care or waiting on of any sick parent, or for other legal or lawful excuse, to attend said school: *Provided further,* that nothing in this act shall prevent. the proper school authorities from excusing any child from the provisions of this act when in their judgment they deem it necessary: *Provided further,* that this act shall not apply to children in said boundary attending some other school for a like time and period.

"Sec. 3. That it shall be unlawful for any parent or guardian to withhold any child from school, and upon conviction shall be fined or imprisoned, at the discretion of the court.

"Sec. 4. That the proper authorities of said school shall have authority to take charge of any of said children of said district, wherever found, and place and keep them in said schools for the period above expressed: *Provided,* that nothing in this act shall allow any person to mistreat or abuse said child or children, or use any more force than is necessary to carry this act into force and effect.

"Sec. 5. That nothing in this act shall apply to any child, parent or guardian with less than one-eighth Indian blood."

The defendant was indicted for violation of this act, and the jury returned the following special verdict:

"We find that, at the commencement of this action and for a year prior thereto, there was a school maintained by the Government of the United States within the Qualla boundary, furnished with all the proper facilities, together with board, clothing, books, medicine, medical attendance and other necessary expenses. That the defendant was the father of a child between the ages of seven and seventeen. That he did not

send said child to the said school for nine months during the last school year. That said child is more than one-eighth Indian blood. That said child was not sick, disabled or necessary for the care or waiting upon of any sick parent. That said child was not in attendance on any other school for a period of nine months during said school year, nor was said child excused from attendance by the proper school authorities. That said defendant resided within the Qualla boundary. That the said school is under the entire control of the United States, and the said school is in no way under the control or management of the Board of Education or school committee, or taught by any teacher under employment of the State. If, upon this special verdict, the Court be of the opinion that the defendant is guilty, then we, the jury, find him guilty; but if the Court be of the opinion that he be not guilty, then we find him not guilty."

The defense seems to rest its case upon three propositions: 1. The defendant is not a citizen of the State, and hence the act is beyond the power of the State Legislature. 2. That the act applies only to Indians, and hence is class legislation and unconstitutional. 3. It is unconstitutional to select out one school district or locality and make education compulsory therein, without applying the same regulation to the rest of the State.

The Constitution (Art. IX, sec. 15) provides: "The General Assembly is hereby empowered to enact that every child of sufficient mental and physical ability shall attend the public schools during the period between the ages of six and eighteen years, for a term of not less than sixteen months, unless educated by other means." The authority is as to "every child" between the ages of six and eighteen, and embraces Indians, as well as whites and blacks. We have long had legislation for separate schools for the Croatans in Robeson. In *State v. Ta-cha-na-tah,* 64 N. C., 614, it was held that the Cherokee Indians resident in this State are sub-

ject to our criminal law, the Court saying: *"Prima facie,* all persons within the State are subject to its criminal law and within the jurisdiction of this Court. If any exception exists, it must be shown. Upon examination of the treaty of New Echotah, Georgia, on 29 December, 1835, between the United States and the Cherokee Indians, we find that, by Article XII, it was provided that individuals and families who were averse to moving west of the Mississippi River might remain and become citizens of the States where they resided.   *   *   * Unless expressly excepted, our laws apply equally to all persons, irrespective of race."

In *Cherokee Nation v. Georgia,* 5 Pet., 1, and *Worcester v. Georgia,* 6 Pet., 515, it is held: "It is the universal doctrine of the public law that the Indians are the domestic subjects of the particular European or American State in which they may happen to be." There are bands of Indians still surviving in New York, Georgia, Wisconsin and in many other States, and the decisions on this point are summed up and reviewed in *State v. Doxtater,* 47 Wis., 278. These decisions show that Indians are subject to the general laws of the State, unless specially excepted, and that they are usually excepted in laws as to taxation and game laws, but not in this State. In this case the General Assembly did not exempt Indians, but specially provided for the application of this law to them in this district. *In re Cherokee Trust Funds,* 117 U. S., 309 (bottom of page), it is said of the Cherokees in North Carolina: "They are citizens of that State and bound by its laws."

The second objection, that this is class legislation and unconstitutional, is equally untenable, as is also the third objection, that it applies to only one locality or district. The Constitution does provide (Art. IX, sec. 2): "The children of the white race and the children of the colored race shall be taught in separate public schools, but there shall be no discrimination in favor of or to the prejudice of either." The white and colored races compose the bulk of the people of this

State, and the object of this provision is plain, but it is clear that this special act in regard to the Indians of the Qualla School District is "no discrimination in favor of or to the prejudice of either" the white or colored race.    And it is also well settled that the Legislature can meet the needs of one county, district or locality without making the same act apply to the whole State.    This was held as to the sale of intoxicating liquor (*State v. Joyner,* 81 N. C., 534; *State v. Stovall,* 103 N. C., 416; *State v. Barringer,* 110 N. C., 525; *State v. Snow,* 117 N. C., 774); restricting sale of seed cotton in certain localities (*State v. Moore,* 104 N. C., 714); as to no-fence laws (*Broadfoot v. Fayetteville,* 121 N. C., 418); as to mode of working public roads (*Tate v. Commissioners,* 122 N. C., 812); and there are other instances (*Intendant v. Sorrell,* 46 N. C., 49, and many cases cited; *State v. Sharp,* 125 N. C., 632, 633).    That the Legislature may provide special regulations for a particular school. district, as where, for instance, the district furnishes by its own action funds in addition to the public school funds, is held in *McCormac v. Commissioners,* 90 N. C., 441.    And the same must be true if the funds come from private donation or the General Government, if the State accepts such maintenance for "a public school district."

The act is not discriminative, because it applies alike to all Indians in that school district.    It could not apply to other races, which go to their own race schools.    It is not objected (indeed, could not be by this defendant) that other races are unduly taxed for the benefit of one race, as in *Lowery v. School Trustees,* 140 N. C., 33, for the school is supported, not by taxation, but by donations from the General Government.

It has been suggested that, the school being supported and maintained by the Federal Government, the State could not compel the defendant to send his child there.    The point does not arise, for the act, while creating the district a "special

STATE *v.* WOLF.

school district," as is also the case with graded schools supported in whole or part by other than State and county funds, and requiring the Indians within that district to send their children between seven and seventeen to school, provided the United States Government furnishes "all proper facilities, together with board, clothing, books, medicine, medical attendance and other necessary expenses," does not require them, specifically, to send the children to the Government School, but specifically says that they may send their children to any "other school for a like time and period." There are exemptions of sick or disabled children, or those waiting on sick parents or having other lawful excuse, or whom the school authorities may see fit to excuse. The law compels attendance on some school, but not on this school, leaving the defendant full choice.

The purview of the act is clear, reasonable and within the scope of the lawmaking power of the State. The Federal Government has established a school for the Indians in the "Qualla boundary," and defrays all expenses, including not only education, but books, board, clothing, medicine, medical attendance and other necessary expenses. The United States Government cannot compel the attendance of the children. The State Legislature makes the "Qualla boundary" a special school district, and, reciting the above facilities afforded by a school established therein, requires (section 2) the Indian children in that boundary "to attend school at least nine months" in each year, without designating this school, and, to avoid such conclusion, provides that the children may comply with the act by attending some other school. The defendant did not send his child to any school.

Upon the special verdict the Judge should have held the defendant guilty. The judgment is reversed. The case is remanded for proper judgment to be entered on the verdict and that the sentence of the court may be imposed.

Reversed.

HOKE, J., concurs in result.

CONNOR, J., dissenting: I do not question that, pursuant
to the provisions of Article IX, section 15, of the Constitu-
tion, the General Assembly is authorized to enact statutes
"requiring every child of sufficient age, mental and physical
ability to attend the public schools" established and main-
tained as a part of the public school system of the State.    I
do not question the power of the General Assembly to extend
this legislation to the children of Cherokee Indians residing
in the State.    I dissent from the conclusion that the General
Assembly has the power to compel such attendance upon a
school for nine months in each year, "under the entire control
of the Government of the United States and no way under
the control or management of the Board of Education or
school committee, or taught by any teacher under employment
of the State."    While this statute is confined to a small num-
ber of Indian children living in the mountains of Swain
County, and, doubtless, in its operation would do but little
wrong, the principle involved is, to my mind, very important
to the preservation of our system of public education.    The
Constitution (Art. IX, sec. 3) commands the General Assem-
bly to provide for the division of each county into a conve-
nient number of districts, in which one or more public schools
shall be maintained at least four months in every year.    We
have decided at the present term that this constitutional re-
quirement is paramount, and that any other provision appa-
rently conflicting with it must give way.    We have sustained
every act of the General Assembly enacted for the purpose of
making the public school system elastic and adjustable to local
conditions and needs.    We have, however, kept always in
view the constitutional provision for a system of public
schools, uniform in essential respects, holding that every pub-
lic school established and maintained by public taxation con-
stitutes a part of the system, and subject to the control either
of committees appointed by the county boards of education or
in such manner as the special statutes provide.    It has never,

I am sure, been supposed that by simply declaring that certain territory shall constitute a school district a school entirely controlled by other than State or local officers could be engrafted into the State's system.      In *Lowery v. Commissioners,* 140 N. C., 33 (page 46), we said: "There can be no possible room for doubt or controversy in respect to the two principles underlying and always controlling the establishment and maintenance of the public school system of this State. The system includes all public schools or schools receiving for their support public taxes, either general or local."      The question was discussed and the authorities reviewed by *Mr. Justice Hoke* in *Smith v. School Trustees,* 141 N. C., 143. The education of the children in the public schools is peculiarly, and in a large measure exclusively, a function of the State—a trust which she cannot delegate to any other agency. The absolute separation of the races and the exclusion of any political or sectarian influence or control are essential to the fundamental and fixed policy of the State.      These can only be secured with absolute assurance by holding strictly to the constitutional provision commanding the Legislature to provide for a uniform system of public schools.      This uniformity, in essentials, must be preserved.      Such variety in matters of administration not affecting the cardinal points regarding race, sectarian issue, etc., is preserved by keeping the public school under the direct control of the people, through their representatives and other officers elected by them for that purpose.      Any departure from this principle will eventually destroy uniformity in the system, introduce novel, disturbing and dangerous expedients, with disaster to the cause of public education, so essential to the welfare of the State.      If this act, with its loose, uncertain provisions, conferring upon the "authorities" of this Government School almost arbitrary powers, can be sustained, it is difficult to see where a limit would be fixed beyond which legislative discretion may not go.      I disclaim any right, as a Judge, to declare an act of

the Legislature violative of the Constitution because I may not deem it wise; but there is no more dangerous fallacy than that which teaches that, for some real or supposed temporary advantage, either department of the government may disregard the supreme law of the State—the people's will formulated and crystallized into the organic law. The people of this State command, in unmistakable terms, their Legislature to provide a system of public schools, and empower it to require compulsory attendance; but certainly they never conferred power to compel attendance upon schools wherein their appointed officers and teachers could not, as a matter of right and duty, enter, supervise and, in all proper manner as prescribed by law, control. In the public schools, nurseries of the State's citizenship, she cannot safely delegate to any other authority the duty of selecting the teachers, prescribing the books, excluding all teaching and training not in harmony with her ideas and ideals. Doubtless the introduction and passage of this law was prompted by good motives and for the purpose of promoting education among the children of the Cherokee Indians, but the best and permanent good to the State is preserved only by keeping all legislation within the limitations fixed by the supreme law. Any experimental expedients not within these limitations are subversive of liberty regulated by law.

We have avoided many of the disturbing questions encountered by other communities. Our population has been divided by well-defined racial distinctions, for which provision is made. Political, sectarian and other lines of separation have been excluded from our public school system. We may avoid them by adhering strictly to the constitutional requirement that in these essential matters we maintain a uniform system of public schools under the control of the people of the State, in accordance with local needs and conditions. I think that the judgment of his Honor should be affirmed.

WALKER, J., concurs in dissenting opinion.